IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF UTAH, | No. C 10-04743 SI |
| Plaintiff, | **ORDER DENYING MOTION TO DISMISS** |
| v. | |
| McKESSON CORP., | |
| Defendant. | |

On April 8, 2011, the Court heard argument on defendant's motion to dismiss. On April 18, the Court referred this case to the United States Judicial Panel on Multidistrict Litigation to determine whether it should be related to MDL-1456, *In Re: Pharmaceutical Industry Average Wholesale Price Litigation*, currently pending before the Honorable Patti B. Saris in the United States District Court for the District of Massachusetts. The MDL Panel declined to relate the case. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

Plaintiff, the State of Utah, alleges that defendant McKesson Corp. engaged in a conspiracy with First DataBank ("First Data" or "FDB") to inflate the amount that Utah's Medicaid program and other "third party payers" paid for brand-name prescription drugs. First Amended Complaint ("FAC") (Doc. 19), ¶¶ 1–2.[1] The general subject of this litigation has been discussed in detail in several orders from the Multidistrict Litigation case *In Re: Pharmaceutical Industry Average Wholesale Price Litigation*,

---

[1] Defendant McKesson Corporation ("McKesson") is a drug wholesaler. First Data Bank is "the leading provider of electronic drug information to the healthcare industry." FAC ¶ 38. FDB is not a named defendant in this action.

MDL-1456 ("the AWP MDL"). *See, e.g., New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 244 F.R.D. 79 (D. Mass. 2007).

According to Utah's complaint, its state Medicaid program paid for brand-name prescription drugs based on a formula tied to the average wholesale price ("AWP") of such drugs. *Id.* ¶ 3. Historically, AWPs were set by drug manufacturers at either 20% or 25% above the wholesale acquisition cost ("WAC") of the drug. *Id.* ¶ 13. Once a particular drug was launched with a 20% or 25% mark-up factor, that factor would remain in place for the life of the drug. *Id.* Companies such as First Data compile and publish AWPs, which are then used to set the standard prices of branded drugs for many health insurers, including state agencies. *Id.* at ¶¶ 9-10.[2]

Utah alleges that, starting in late 2001, McKesson began conspiring with First Data to inflate the AWPs for hundreds of drugs. Utah alleges that, around mid-2000, McKesson "stopped calculating its suggested sale prices according to the manufacturers' historic markup and instead unilaterally adopted a higher markup." *Id.* at ¶ 16. First Data subsequently adopted this higher price, and McKesson "engaged in further discussions with [First Data] to raise additional AWPs." *Id.* ¶ 19. Utah alleges that First Data and McKesson conspired to conceal the source of the AWP figures by effectuating price changes only when another WAC-based price announcement was being made by a drug manufacturer. *Id.* ¶ 20. According to Utah, the result of this scheme was that "McKesson and First Data, without any legitimate economic justification, raised the WAC-to-AWP mark-up to 25% for over four hundred brand-name drugs that previously had received only the 20% mark-up amount." *Id.* ¶ 20.

Based on these allegations, Utah asserts five causes of action against McKesson: (1) civil violations of RICO, 18 U.S.C. section 1962(c), for "associating with an enterprise that engaged in a pattern of racketeering activity," *id.* ¶ 247; (2) RICO conspiracy, 18 U.S.C. section 1962(d), for

---

[2] Prior to March 2005, First Data claimed to survey wholesale drug companies in order to verify the prices reported by drug manufacturers, and to use that information to determine the AWP index. On March 15, 2005, First Data sent its customers a letter informing them that

> ***[First Data] has historically relied on drug manufacturers and wholesalers to report or otherwise make available information concerning their list price for drugs.*** Unfortunately, [First Data] is no longer able to obtain information relating to list prices directly from wholesalers in a manner that is consistent with [First Data]'s editorial standards and policies. . . . Effective immediately, [First Data] will no longer survey drug wholesalers for information relating to their catalog or list prices.

FAC ¶ 239 (emphasis in FAC).

1 "knowingly join[ing] First Data in a conspiracy to manipulate AWPs . . . [,]" *id.* ¶ 285; (3) common law
2 civil conspiracy, *id.* ¶¶ 292-96; (4) common law tortious interference with contract, *id.* ¶¶ 297-302; and
3 (5) violations of the Utah False Claims Act ("UFCA"), Utah Code Annotated sections 26-20-9.5 *et seq.*,
4 by "knowingly act[ing] in deliberate ignorance or reckless disregard of the truth . . . resulting in great
5 financial loss to the State." *Id.* ¶ 339. Utah seeks treble damages, restitution, fees and costs, and
6 declaratory and injunctive relief.

## LEGAL STANDARD

9 Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it
10 fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss,
11 the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*
12 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff
13 to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."
14 *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading
15 of specifics," a plaintiff must provide "more than labels and conclusions," and must allege facts
16 sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

17 In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court
18 must assume the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's
19 favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not
20 required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or
21 unreasonable inferences." *St. Clare v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536 F.3d 1049,
22 1055 (9th Cir. 2008). The court "must consider the complaint in its entirety, as well as other sources
23 courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents
24 incorporated into the complaint by reference, and matters of which a court may take judicial notice."
25 *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007).[3]

---

[3] Although some or all of Utah's claims may be subject to the heightened pleading requirements of Rule 9, those heightened pleading requirements are not relevant to this motion to dismiss, as McKesson does not challenge the particularity with which the claims are pled.

3

**DISCUSSION**

McKesson moves for dismissal of Utah's amended complaint, arguing that the statute of limitations on all of the claims has run, and that Utah failed to allege all of the required elements of its civil RICO claims.[4]

## I. Civil RICO claims

### A. Statute of limitations

The statute of limitations for a civil RICO action is four years. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987). This limitations period "begins to run when a plaintiff knows or should know of the injury which is the basis for the action." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005). In other words, civil RICO claims accrue when a plaintiff has either actual or constructive knowledge of a defendant's fraud. *See id.* "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001).

Under *American Pipe* and a tolling agreement signed by the parties, the limitations period in this case has been tolled since August 2008, when a group of states and local governments filed *Board of Commissioners of Douglas County, Kansas v. McKesson*, No. 08-cv-11349 (D. Mass), a national class action lawsuit that was consolidated with the AWP MDL, in which public payors asserted the same civil RICO claims being brought by Utah here. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008) (explaining that *American Pipe* "allows tolling within the federal court system in federal question class actions").[5]

---

[4] In support of its motion to dismiss, McKesson has filed a request for judicial notice of various court documents and documents extrinic to Utah's complaint. The Court takes judicial notice of the court documents presented by McKesson, but declines take notice of the documents.

[5] The tolling agreement went into effect on May 12, 2009.

Thus, if it is clear as a matter of law from Utah's complaint that Utah had constructive knowledge of the fraudulent scheme before August 2004, then plaintiff's civil RICO claims have expired. If not, then plaintiff may proceed.

McKesson argues that Utah had constructive knowledge of the allegedly fraudulent scheme "no later than the end of 2003." Def. Mot. to Dismiss at 8. McKesson points to Utah's complaint, in which Utah alleges that a spike in AWP markups occurred in 2002, and in which Utah quotes a 2003 statement by McKesson's "Vice President of Brand Rx Finance Investment Purchasing" as saying that the AWP for 95% of brand name drugs was WAC plus 25%. *See, e.g.,* FAC. ¶ 21 (Chart); ¶ 124; ¶ 139. McKesson argues that a diligent investigation, commenced at that time, would have led Utah to discover in 2005 the original law suit filed with regard to rise of average wholesale prices, during which McKesson's role in the allegedly fraudulent scheme was discovered, and an October 2006 a *Wall Street Journal* article that described McKesson's involvement in the alleged scheme.

McKesson made a similar argument in the *Douglas County* case, in opposition to a motion to certify a class of public payors. Rejecting McKesson's argument that "knowledge of increases in AWPs was sufficient to trigger the statute of limitations even if there was no knowledge of the underlying fraud," the district court wrote that "[i]n a market where drug pricing was notoriously opaque and where AWPs were frequently increased by manufacturers for various reasons, public payors could not possibly have known that a price increase was the result of a fraud perpetrated by a wholesaler in cahoots with the price reporting service." *In re McKesson Governmental Entities Average Wholesale Price Litigation*, 767 F. Supp. 2d 263, 272–73 (D. Mass. 2011); *see also id.* at 273 (explaining that a bulletin "which described increased costs . . . and encouraged recipients . . . to take mitigating measures . . . does not trigger a duty to investigate whether or not these increased markups were the result of fraud as opposed to normal markups in the pharmaceutical industry").

Ordinarily, the question of when a plaintiff had actual or constructive knowledge of a fraud is a question of fact for the jury. *See Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988). This case is no different. It is not clear at this point when Utah had enough information to warrant an investigation.

### B. Racketeering allegation

The elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs*, 431 F.3d at 361 (internal quotation marks omitted); *see also* 18 U.S.C. §§ 1962(c), 1964(c).

#### 1. A pattern of racketeering activity

McKesson argues that Utah has alleged only a "single completed scheme, with a single purpose, based on a single core falsehood," and therefore has failed to allege a *pattern* of racketeering activity. Def. Mot. to Dismiss at 12. Utah argues that each act of setting a higher AWP for a drug under false pretenses constitutes a different, but related, predicate act.

In order to establish a pattern, the plaintiff must "show that the racketeering predicates are related [to each other], and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). Although a plaintiff must also prove "continuity," he is not required to establish that the conspirators have engaged in multiple schemes. Rather, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Utah has sufficiently alleged a pattern of racketeering activity, undertaken over a multi-year period, and consisting of hundreds of different but related fraudulent acts.

McKesson argues that this case is like *Durning v. Citibank, International*, 990 F.2d 1133 (9th Cir. 1993), but *Durning* is readily distinguishable. In *Durning*, the "alleged fraud consist[ed] of [the defendants'] dissemination of . . . one misleading document in conjunction with a single issuance of bonds." *Id.* at 1139. This case is more analogous to a situation where a party issues hundreds of *different* bonds, all accompanied by a single misleading representation about the bonds. That the alleged activities of McKesson can be described as having one overarching goal, and as being fraudulent for one overarching reason, does not entitle McKesson to dismissal. *See H.J. Inc.*, 492 U.S. at 241 (rejecting

6

rule that a single scheme cannot constitute a civil RICO violation).

### 2. Causation

McKesson argues that Utah has not properly alleged that it suffered losses caused by the RICO conspiracy.

In order to establish that a pattern of racketeering activity has "caused injury," a plaintiff must make a showing of both but for and proximate causation. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

> Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient.

*Hemi Group, LLC v. City of New York, N.Y.*, 130 S.Ct. 983, 989 (2010) (internal citations omitted).

Utah alleges the existence of a scheme with a goal of causing those whose reimbursement rates for prescription drugs were tied to AWPs to pay higher reimbursement rates by fraudulently inflating the AWPs for hundreds of drugs. Utah alleges that it in fact paid rates based on the AWPs, and that it continued to pay those rates even as they increased due to McKesson's fraudulent concealment of the real reason that the rates were going up.

McKesson argues that this is insufficient, because Utah did not allege in its complaint an alternate course of conduct that it would have taken had it known the true reasons for the increase in the AWPs. McKesson cites *In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) in support of its argument.

In the *Actimmune* litigation, the district court dismissed civil RICO claims because the plaintiffs "failed to allege that it was defendants' allegedly fraudulent misrepresentations about Actimmune®, rather than the scientific literature or any other factor" that "caused physicians to prescribe Actimmune®, and caused consumers and TPPs to pay for Actimmune®." *Id.* at 1045, 1053. Here, unlike in the *Actimmune* litigation, Utah has alleged facts supporting both but for and proximate causation: that its reimbursement rates for prescription drugs were directly tied to AWPs, that McKesson committed its alleged fraud in order to increase reimbursement rates ties to AWPs, that Utah

7

continued to tie those reimbursement rates to AWPs based on McKesson's alleged fraud, and that McKesson's alleged fraud actually caused the AWPs to increase.

Utah has sufficiently alleged that it was McKesson's fraud—as opposed to any other factor—that caused its reimbursement rates to increase. Utah is not also required to plead what measures it would have taken had McKesson chosen to disclose the basis for the AWP increases.

## II.     **Utah False Claims Act**

Utah also brings a claim under the Utah False Claims Act ("UFCA"), which prohibits parties from "enter[ing] into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false, fictitious, or fraudulent claim for a medical benefit." Utah Code Ann. § 26-20-6. Utah requests restitution and civil penalties under the Act. The parties dispute whether these claims are time-barred, and the analysis of this question is complicated by various recent amendments to the potentially applicable statutes of limitations.

Until April 30, 2007, remedies sought under the UFCA were subject to the general statutes of limitations set forth in Utah's Judicial Code.[6] McKesson argues that Utah's UFCA claims accrued significantly before that date, and were subject to a one year statute of limitations that ran before April 30, 2007. Utah argues that even if its claims did accrue before April of 2007, the relevant statute of limitations – either a one year statute of limitations for civil penalties or a four year "catch-all" statute of limitations for restitution -- had not run.

"The general and well-established principle of law is that statutes prescribing limitations relate to remedies." *Del Monte Corp. v. Moore*, 580 P.2d 224, 225 (Utah 1978). Utah argues that the "catch-all" statute of limitations applies to Utah's claim for restitution under the UFCA. *See* Utah Code Ann. § 78B-2-307 (formerly cited as UT ST § 78-12-25) ("An action may be brought within four years . . .

---

[6] In April 30, 2007, the State of Utah amended the UFCA, providing that the statute of limitations for remedies sought under the statute would be six years after the violation or three years after discovery, up to ten years maximum. *See* Utah Code Ann. §§ 26-20-15(1). Although the amendment to the UFCA's statute of limitation provides that it is retroactive, it could not serve to revive a claim under the Act that had already expired. *See Del Monte Corp. v. Moore*, 580 P.2d 224, 225 (Utah 1978) ("[I]f the statute has run on a cause of action, so that it is dead, it cannot be revived by any . . . statutory extension.").

8

(3) for relief not otherwise provided for by law."). However, Utah's "four-year catch-all statute of limitations applies to all causes of action, legal or equitable, 'in which affirmative relief is sought' and another 'more specific' statute of limitations does not apply." *In re Hoopiiaina Trust*, 144 P.3d 1129, 1136–37 (Utah 2006) (quoting *American Tierra Corp. v. City of West Jordan*, 840 P.2d 757, 760 (Utah 1992)). In this case, a more specific statute of limitations would apply to Utah's claim for restitution if it accrued before April 30, 2007—to wit, the provision cited by McKesson, which states that "[a]n action may be brought within one year: . . . (3) upon a statute, . . . for forfeiture or penalty to the state." *See* Utah Code Ann. § 78B-2-302 (formerly cited as UT ST § 78-12-29). This is true because, before April 30, 2007, Utah Code Ann. § 26-20-9.5 provided, in part, that:

> (1) Any person who violates this chapter shall, in addition to other penalties provided by law, be subject to *the following civil penalties*:
>
> > (a) in all cases, shall be required to make full and complete restitution to the state of all medical benefits improperly obtained; . . . .

Emphasis added. Thus, an action for restitution under the UFCA was "[a]n action (3) upon a statute, . . . for penalty to the state," and it was subject to a one-year statute of limitations. *See* Utah Code Ann. § 78B-2-302.

If Utah's UFCA claim accrued before May 12, 2006, the statute of limitations has run. If not, then the statute of limitations was extended and had not yet run by the time Utah and McKesson entered into a tolling agreement on May 12, 2009.[7]

Where fraud is an element of an action itself, and a statute does not provide otherwise, the statute of limitations "does not begin to run until the fraud was discovered or reasonably could have been discovered." *Attorney General of Utah v. Pomeroy*, 73 P.2d 1277, 1300 (Utah 1937), *superceded in part by statute on other grounds as recognized in Penrose v. Ross*, 71 P.3d 631 (Utah Ct. App. 2003). This is the same rule that applies to civil RICO claims. As with Utah's civil RICO claim, it is not clear at this point when Utah had enough information to warrant an investigation.

---

[7] It does not appear that Utah's UFCA claim was tolled by the filing of the class action in Massachusetts, which did not allege violation of the UFCA. *See Clemens*, 534 F.3d at 1025; *American Tierra Corp. v. City of West Jordan*, 840 P.2d 757, 762–63 (Utah 1992) (importing the holding of *American Pipe* into Utah state law, but in a case where the putative class action had raised the same Utah state law claim).

9

### III. Common law claims

In addition to its RICO and UFCA claims, Utah alleges civil conspiracy and tortious interference with contract. The parties agree that California law applies to these claims under the choice of law rules, and that Utah's civil conspiracy claim does not exist independently, but rather is dependent on the continued existence of one of the underlying claims: tortious interference with contract or violation of the UFCA. *See* Mot. to Dismiss at 17, 20; Opp. at 19. McKesson argues that the statute of limitations for both common law claims has run.

In California, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–511 (1994). Liability for civil conspiracy generally requires three elements: (1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy. *Id.* at 511; *see also People v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 137 (2003) ("In addition to those three elements, it has been said that participants in a conspiracy also must know that their conduct is wrongful. . . . However, to the extent that knowledge of the scheme's unlawful purpose is required, it may be inferred from the surrounding circumstances, including the nature of the acts done, the relation of the parties, and the interests of the defendants.").

Proof of a civil conspiracy triggers the "last overt act" doctrine. *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 786 (1979). "Under that doctrine, the statute of limitations does not begin to run until the final act in furtherance of the conspiracy has been committed." *Beaumont*, 111 Cal. App. 4th at 137.

Under California law, tortious interference with contract is governed by a two-year statute of limitations. *Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 683 (9th Cir. 1980); *see also Maritz Inc. v. Carlson Mktg. Group*, No. C 07-5585 JSW, 2009 WL 3561521, at *2 (N.D. Cal. Oct. 30, 2009). Utah has alleged that McKesson tortiously interfered with its contracts through its participation in a conspiracy with FDB, and therefore the "last overt act" rule governs when the statute of limitations began to run. If the "last overt act" of the conspiracy occurred after May 12, 2007 (two years before the parties entered into a tolling agreement), then Utah may proceed with its claim.

10

Utah argues that the last overt act of the conspiracy was FDB's final publication of the inflated prices before it rolled back the price increases in September 2009. McKesson argues that the last overt act occurred no later than 2005, with the final markup of the AWP of a drug.

Although McKesson's role in the alleged conspiracy was to increase AWPs, the alleged conspiracy included FDB, whose role was to publish the inflated AWPs while concealing the source of the figures. In its complaint, Utah alleges that even when FDB acknowledged in 2005 that it was no longer *updating* its AWPs with new survey data, it continued to induce reliance on AWPs that were based on earlier figures—figures that had been fraudulently inflated—and continued to obscure the true source of the AWP data. FAC ¶ 239. Thus, Utah has alleged that each time FDB republished AWP data, before it rolled back price increases in September 2009, it was committing in overt act in furtherance of the conspiracy.

## CONCLUSION

For the foregoing reasons and for good cause shown, defendant's motion to dismiss is DENIED. (Doc. 22.)

**IT IS SO ORDERED.**

Dated: July 19, 2011

SUSAN ILLSTON
United States District Judge